No. 36,847

A. B. CHAPMAN, Administrator with Will Annexed of the Estate of Lila E. Root, Deceased, *Appellee*, v. GAS SERVICE COMPANY, and CLARK PENNICK, *Appellants*.

(190 P. 2d 367)

Opinion filed March 6, 1948.

P. K. *Smith,* of Wichita, argued the cause, and *Robert D. Garver, A. M. Ebright, Ralph E. Gilchrist* and *Harold Goodwin,* all of Wichita, were with him on the briefs for the appellants.

W. L. *Cunningham,* of Arkansas City, argued the cause, and *E. J. Taggart* and *J. H. Taggart,* both of Wellington, *J. T. Boyle, D. Arthur Walker* and *William E. Cunningham,* all of Arkansas City, were with him on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: This is an action for damages for the wrongful death of a woman alleged to have been killed when natural gas exploded and destroyed two buildings, in one of which she was working. Judgment was for the plaintiff. Defendants appeal.

About much of the evidence there is no dispute. The controversy arises in the main over the conclusions, inferences and presumptions to be drawn from it.

The explosion occurred in Belle Plaine. Defendant Gas Company had about 280 customers there. The time of the explosion was October 9, 1945, at about ten o'clock a. m. A drugstore and hardware store were demolished and adjoining buildings damaged. Lila Root, the woman on account of whose death this action was brought, was an employee in the Chapman hardware store, one of the buildings destroyed. She left a husband and three minor children surviving her. This action was brought for their exclusive benefit.

Much of the evidence has to do with the buildings and the general situation in the neighborhood, so that will receive our attention at the outset. The buildings with which we are concerned face north on Fifth avenue in Belle Plaine. This particular block is bounded on the east by Merchant street and on the west by Linden street. The regular alley runs north and south in about the middle of the block.

The first building west of Merchant street and fronting on Fifth avenue was what will be referred to herein as the Goheen drugstore. It was about twenty-five feet wide, perhaps seventy or eighty feet deep. The second story was used for a storeroom. The building next west of that was the Chapman hardware store. It was about twenty-five feet wide and the building itself was as deep as

the Goheen building. There was, however, on the rear of it a building referred to as the cream room. This was not quite so wide as the building itself and about twenty feet deep. It had been erected at a later date than the Chapman building itself and was called the cream room because the building had formerly housed a grocery store and this room had been built and used as a place where the processes incidental to buying milk and cream had been carried on. Just in front of the cream room and under the southeast corner of the building was a basement about eight by twenty feet. The balance of the floor was high enough above the ground that a man could crawl along under it. The second story of the Chapman building was occupied by the Masonic lodge. There was a door in the floor of the store which opened into the basement. This was closed on the day of the explosion. The floor was a double one with paper between the two floors. There was an open flue from the first floor to the roof on the west side of the building.

West of the Chapman building was the Olmstead building. It was about fifty feet wide on the ground floor and was divided into two stores, the east one occupied by the Kansas Gas and Electric Company and the west one by a business not shown in the record. There was a hall through the middle of the upstairs of this building. On the east was one apartment and on the west two. These were occupied at the time of the explosion. The west half of this building about ten feet was deeper than the east half. Between the Olmstead building and the alley were two buildings with which we are not concerned here. There are some buildings south of the Goheen building, to which we shall give our attention. Immediately south of it and separated by a stairway is the Hurst building. It fronts on Merchant street and extends west about twenty-five feet, so that its west end is about even with the west side of the Goheen building. The Austin grocery store is south of it and extends west about seventy-five feet. South of this is the Moffitt garage about sixty feet wide. South of that is Tab Lane's pool hall. We shall hear of this pool hall later in this opinion. The ground immediately south of the buildings facing on Fifth avenue is referred to in this record sometimes as an alley and sometimes as an alleyway. It is not a regularly laid-out alley, however, but has been used for years as a driveway by means of which trucks and drays could deliver goods to the rear doors of the various stores involved.

The gas company had a main on Merchant street and one on Linden avenue. From Linden avenue a three-inch main ran east in the rear of the buildings we have mentioned to a point just south of the east side of the Chapman building. Originally it had run clear through to Merchant street but when the Hurst building was erected this main was cut off and capped just before it came to the cream room. This main furnished gas to the Chapman building, the Masonic lodge and to both sides of the first floor of the Olmstead building and the three apartments occupying the second story of that building. The Goheen building obtained its gas by means of a line from the main in Merchant street. There was also a line from the Merchant street main to the Hurst building. The surrounding buildings and ground drain into this so-called alleyway south of these buildings and on account of different businesses that had been carried on in these buildings from the beginning, material, such as cinders, salt water, battery acid and refuse from outhouses had been deposited in this alleyway so that the soil was detrimental to the life of pipes. There is some dispute in the record as to this but there was substantial evidence to warrant the jury in treating it as an established fact. The cream room was not quite as wide as the Chapman building so that a few feet of the west side of the building was on this alleyway. There was a window there and the gas meter for this building was under this window. The service line to this meter was attached to the three-inch main about where it had been cut off years before. When it reached the building it turned east a few feet to a point just underneath the window where the meter was set. The Chapman building had formerly been occupied by a grocery store. Some real estate trades had been made and during the summer of 1945 the grocery store vacated the building. The proprietor removed most of his gas pipes and appliances. The Chapmans, whose hardware store had been across the street, had moved in and were arranging their stock when the explosion occurred.

Mrs. Chapman testified that she asked Mr. Pennick, the local gas man, on the third day of October to set their meter; that he came in with another man, worked around awhile, finally as he was leaving said he found one leak and plugged it and everything was okay; that she asked him if she should report to him when she was ready to turn it on and he said "No, let Earl do it." Earl was Mr. Chapman and there is evidence that he was an experienced plumber.

Mrs. Chapman's daughter testified to about the same effect. A witness for the gas company who helped set the meter testified that they set the meter and turned the gas on and it showed gas passing through; that they then capped a tee in the cream room; that they turned the gas on again and it still showed registration; that there was a three-inch stop cock on the line that went into the building and when they turned that off there was no registration. He testified that as they went out he and Pennick told Mrs. Chapman the meter registered tight but with the stop cock off it would register at the meter. He testified this occurred on September 29, 1945.

At any rate this conversation occurred not earlier than September 29, 1945. Up to that time no gas had been connected with the building since some weeks before when the grocery store had vacated.

The next we hear is when Earl Chapman connected a stove and turned on the gas. That happened on Saturday, October 6, 1945. A former witness had testified about having during 1943 run a pipe from the meter as it then stood to a faucet about thirty feet from the south end of the building and having put in a riser from this pipe up through the floor. Mr. Chapman testified that he connected a stove to this riser; that he screwed a hose cock on the riser; put a piece of welding hose on the petcock and connected the other end of the hose with the stove; that he used white lead on all the connections and when he had the connection made he turned the gas on in the building at the meter; that he then took a lighted match and tested the length of the hose and all connections.

The stove had burned on Saturday. It had not burned on Sunday, but had on Monday. Mrs. Chapman turned it off on Monday evening at six o'clock at the stove and Mr. Chapman turned off the petcock at the place where the hose was attached to the riser. Several people were in the store that morning and none of them detected the odor of natural gas.

Mrs. Root and Mrs. Chapman were alone in the store at the time. Mrs. Root was working on some shelves on the west side of the store. Mrs. Chapman was near the middle of the store. There was no noise to the explosion. When Mrs. Root's body was found it was between the heaved-up floor boards and the joists. The palms of her hands were blistered, the sides of her face and neck were seared, her eyebrows and eyelashes burned off, her hair net was burned back to her hair, the front part of her legs was burned and

part of the fringe of her scarf was burned. The floor was torn loose from the joists and was pushed up six to eight feet along the center line. Some of the joists underneath the floor were burned. All the walls of the Goheen and Chapman buildings were demolished and the east wall of the Olmstead building was blown down.

Sometime during the afternoon the gas company dug down, took a section out of the main in the rear of the store, and plugged it so that gas no longer flowed into the service pipe that led to these buildings.

All the buildings in the neighborhood except the Chapman building had concrete floors, the surface of the ground was hard clay and the soil was loose underneath, the south foundation wall of the Chapman building was built of soft bricks so that rats had eaten holes in it, during 1938 or 1939 there had been a leak in the gas mains at Tab Lane's pool hall, the gas pipes laid in the alley were badly rusted, fitted and corroded; several witnesses testified to having smelled the odor of natural gas in the alley back of the store. Two witnesses testified to making tests of the soil in the rear of these buildings, with different devices, they both found this soil permeated with gas. One of these was a consulting chemist. He testified to making several tests and finding gas in some ten holes dug into the soil, the soil had a gas odor and the color was black as though the gas had been excluded from it. He testified as an expert that from the examination he had made of the entire situation it was his opinion that the gas which caused the explosion came from the pipes of the company and followed along water, sewer and gas pipes under the floor of the store; the riser to which the meter was attached was so loosely screwed into the collar underground that it was loose, could be unscrewed by hand, would permit the escape of gas.

While the expert was on the stand he testified on cross-examination about two circumstances, to which we should now refer.

Some weeks after the explosion the rock and brick were removed from where it covered the meter. The reading on that meter when it was installed was stated to the witness and he was then asked what the reading was when it was recovered; he stated what that was and it showed that 34,800 cubic feet of gas went through this meter between September 29 and October 9. This was a great deal more gas than could possibly have been burned by the stove, to which reference has been made. Defendant gas company argues

from this circumstance that this gas passed through the meter and was sufficient to have caused the explosion and must have escaped due to some defect in the gas fixtures and pipes within the store for which the gas company was not responsible. A factor in this argument is that the riser from the pipeline to the meter was found broken when the rock and brick were removed from it some weeks after the explosion. From this circumstance defendant argues that gas stopped going through the meter into the building at the instant of the explosion. The flaw in this argument is that the riser may have broken sometime after the explosion so that up until the time when gas was cut off at the main it continued to go through the meter. Another flaw is that defendant's employees on September 29 and Mr. Chapman on the Saturday before the explosion on Tuesday tested the meter and there was no gas passing through it except at the stove over which Mr. Chapman had charge.

Another circumstance to which the expert for plaintiff testified had to do with a test made by the company. The expert testified as to a test at which the company asked him to be present along with others. The gas company plugged up the line everywhere they knew it was open, then it took a pump, something like a tire pump that had pressure gauges attached to it, which registered in ounces, pumped air into the line until the pressure reached a certain amount, then shut off the valve. If there was a leak the air would escape and the pressure on the gauge would fall. It would fall rapidly if it was a large leak. The expert testified that under this test the gauge fell very little and based on that test not sufficient gas could have escaped from that line to cause the explosion. On cross-examination he testified that if he had known about the large amount of gas that went through the meter it would not change his opinion that gas escaping from the lines in the alley and following along the pipes caused the explosion.

Defendants demurred to the evidence of plaintiff on two grounds: First that it failed to prove they were negligent in allowing gas to escape from their lines; and second that there was no evidence upon which a jury could base a judgment for pecuniary loss. We shall consider first the argument as to the first ground. Defendants argue there is no evidence whatever of a leak either in the property owner's service line after notice to the company or in the defendant's line without notice; they then refer to the test to which reference has already been made and argue that this evidence disclosed that the

line was tight and it was impossible for enough gas to escape to cause any kind of explosion. Defendants cite and rely on opinions where we have said presumption based on presumptions and inferences based on inferences are insufficient to meet a burden of proof. There is no doubt about the soundness of that rule. The trouble arises when we have the responsibility of applying it to the facts.

On the consideration of a demurrer to the evidence we take as true all evidence in favor of the party on whom rests the burden of proof and draw all reasonable conclusions and inferences in favor for that party.

The plaintiff had pleaded that defendant had been negligent in maintaining its lines in the rear of the buildings described in an unsafe and defective condition so that they did not confine the gas transported through them but allowed it to escape and flow under the Chapman building; that the defendant company had failed to make any reasonably adequate test and inspection of the same lines when a reasonably careful inspection would have disclosed to both defendants that these lines were in a dangerous and defective condition; that both defendants permitted gas belonging to the company to pass through these lines when they by any reasonably careful inspection should have known these lines were leaking gas and were dangerous; that they failed to make any reasonably careful inspection of these lines to discover their condition and to ascertain whether gas was escaping and passing into the basement of the Chapman hardware store building in dangerous and explosive quantities; that they installed the meter adjacent to the Chapman store and turned on the gas when they knew and by exercise of ordinary care should have known that gas was leaking from those lines and there was immediate danger of it passing into the basement of the Chapman hardware store; that they carelessly installed the meter in that they failed to apply a sealing compound and did not screw the pipes together in a proper manner, all of which caused and permitted gas to escape from the control of defendants and to flow under the building occupied by the Chapman hardware store; that they failed to remove, repair or replace all the defective pipes and to remove the accumulated pipe from under the building occupied by the Chapman hardware store.

The motion of defendants to require plaintiffs to make their petition more definite and certain was overruled. The defendants did not demur to the petition but filed an answer in which they denied

generally all the allegations of the petition except the incorporation of defendant gas company and the employment of Pennick.

There was no motion to compel plaintiff to elect upon which acts of negligence he relied. Stated succinctly they amount to an allegation that the mains and lines in the rear of the stores in question were so defective as to permit gas to escape in sufficient quantities so that it accumulated under the floor of the Chapman hardware store building and caused the explosion and that defendants could have discovered this condition by a reasonable inspection, which they did not make.

Such a burden, just as any other, may be met by circumstantial evidence. In *Cramm v. Hutchinson Gas Co.,* 130 Kan. 853, 288 Pac. 599, a gas explosion case, we said:

"The plaintiff relies on circumstantial evidence and the process of elimination to establish negligence on the part of the defendant. The plaintiff argues that from the circumstances surrounding the explosion, from the conditions which existed immediately after it, and from the fact that the pipes in the house, after the explosion, did not have a sufficient leak in them to allow enough gas to escape to cause the explosion, the conclusion must be reached that the explosion was caused by gas escaping from the meter." (p. 854.)

That opinion quoted from *Hashman v. Gas Co.,* 83 Kan. 328, 111 Pac. 468, as follows:

"It is contended that if defects or leaks existed there was no proof that appellant had notice of them. Natural gas, as all know, is inflammable and explosive in a high degree—a very dangerous agency—and those who transport it are held to the exercise of great care; they are required to lay and maintain pipes that are safe and secure for transporting gas, and carefully to overlook and inspect the pipes in order to keep them in a safe condition, and to detect and repair any leaks or defects in them . . . The taking of reasonable precautions for the detection of leaks would have acquainted defendant with the defects in ample time to have repaired them. The jury had a right to infer that the gas company either knew or should have known of the leaks and defects before the explosion." (p. 854.)

*Sternbock v. Consolidated Gas Utilities Corp.,* 151 Kan. 81, 98 P. 2d 162, was a case where the plaintiff relied on circumstantial evidence to prove the cause of a fire which destroyed a building was natural gas which escaped from defendant's lines. Defendant gas company argued the evidence of plaintiff did not exclude other possible agencies which might have caused the fire. We said:

"It is true plaintiff attempted to establish the cause of the fire by circumstantial evidence. If such evidence fairly authorized the inference of negligence it was sufficient. (*Hashman v. Gas Co.,* 83 Kan. 328, 111 Pac. 468;

*Cracraft v. Wichita Gas Co.,* 127 Kan. 741, 742, 275 Pac. 164.) This, however, was not a criminal action, but a civil action, and in order to sustain a verdict in a civil case circumstantial evidence need not rise to that degree of certainty which will exclude every reasonable conclusion other than that arrived at by the jury. (*Railroad Co. v. Perry,* 65 Kan. 792, 70 Pac. 876; *Railway Co. v. Wood,* 66 Kan. 613, 72 Pac. 215; *Hashman v. Gas Co.,* 83 Kan. 328, 329, 111 Pac. 468; *Cracraft v. Wichita Gas Co.,* 127 Kan. 741, 742, 275 Pac. 164; *Asche v. Mathews,* 136 Kan. 740, 18 P. 2d 177; *Noller v. Aetna Life Ins. Co.,* 142 Kan. 35, 38, 46 P. 2d 22.)" (p. 86.)

In *Jelf v. Cottonwood Falls Gas Co.,* 160 Kan. 112, 160 P. 2d 270, the plaintiff had recovered a judgment against the gas company for negligently permitting gas to escape from its pipes and flow under a house where it exploded and destroyed the house. The defendant argued there was no substantial evidence to sustain the allegations of negligence. We said:

"It is not necessary that the plaintiff in order to recover for the explosion of natural gas in the house show the exact nature of the defect." (p. 118.)

In the case of *Cracraft v. Wichita Gas Co.,* 126 Kan. 775, 271 Pac. 273, this court approved the practice of proving negligence on the part of a gas company by a process of elimination. We said:

"The findings in our opinion, were amply sustained by the evidence. For instance, by a process of elimination the plaintiff showed that the explosion was not caused by gasoline fumes nor sewer gas, but that it was caused by natural gas, and that it was not possible for the natural gas to have come into the building from the high pressure lines of the Wichison Gas Company a few blocks distant, and must therefore have come from defendant's lines." (p. 776.)

The evidence of plaintiff has already been set out in detail. The odor of natural gas had been detected for some time in the general vicinity of the rear of these stores, this had been brought to the attention of the agents for defendant gas company; the meter and pipes leading into the store had been tested by agents for the gas company a few days before the explosion and found to be tight; the only installation by which gas was taken into the store through the meter had been tested on the day before the explosion and found tight; there was evidence from which a reasonable inference was that the explosive force came from underneath the floor; the pipe from the main to the meter was installed in an inefficient and loose manner; the mains had been laid since 1905 or 1907; the soil in this particular part of the system was detrimental to the life of pipe; this was black pipe and there was evidence from which the reasonable inference was that the life of black pipe in soil such as this was much

less than the length of time this pipe had been in the ground; sometime before this there had been a leak of gas from the system at Tab Lane's pool hall in this general vicinity sufficient so that when a match was struck a flame appeared; the surrounding soil had been saturated with natural gas so that it could be detected with machines used for that purpose; an expert gave it as his opinion that the explosion was caused by natural gas leaking from the company's pipes and flowing along other pipes, thereby entering the space under the building. There was evidence there was from 45,000 to 134,000 cubic feet of gas that came into the system each month which was not accounted for at the consumer's meters. All these and other surrounding facts and circumstances were such as to constitute substantial evidence that the explosion was caused by gas which had accumulated under the floor of the Chapman building and it had escaped from the mains and pipes of the gas company, defendant, through the negligence of that company in negligently maintaining these lines. The court did not err in overruling the gas company's demurrer to the evidence of defendant on this ground.

Defendant next argues the demurrer should have been sustained because there was no evidence upon which the jury could base a judgment for pecuniary loss. In this connection counsel for the defendant say:

"In this case the burden of proof was on the Administrator as plaintiff to show that a financial loss occurred. In this the plaintiff failed and there was nothing upon which a jury could base a verdict except the fact that the woman had been employed at an unknown salary for 5 years. That she was 35 years old and had a life expectancy of 31 years. Whether she contributed anything to her husband and children, whether they suffered any financial or pecuniary loss was left purely to speculation and conjecture."

By this argument defendant asks us to hold that when a wife and mother is killed through the negligence of a third party, her husband and children cannot recover for her death unless they prove that she contributed money to them. That is not the law. This petition alleged, among other things, as follows:

"17. At and prior to the time of her death, Lila E. Root was a healthy, able-bodied woman of the age of 35 years, with a life expectancy of 31.78 years. She was by profession and occupation, a mother, wife and housekeeper. She was a mother devoted to the welfare, training and education of her children, devoting her time and attention to them; she was kind, considerate, and affectionate to her husband and children, performing her house-

hold duties and looking after their welfare; all of which plaintiffs have lost by reason of her death.

"18. The reasonable and necessary funeral expenses of Lila E. Root were Six Hundred thirty-two and no/100 ($632.00) Dollars.

"19. Plaintiff, Alvin A. Root, at the time of the death of his wife, was of the age of 34 years, with a life expectancy of 32.50 years."

The defendant expressly admitted all these allegations. There was no question but that she was employed at the Chapman store. It is a reasonable inference that under the admissions of these pleadings and while she was employed she did contribute something in money to her husband and children. She did not have to do this, however. She was a wife and mother. If she did not leave home at all, just stayed there and made beds, washed dishes, cooked meals, swept floors, mended clothing, did the laundry, helped the children with their homework, balanced the household budget and did the myriad other things housewives and mothers do, her loss would be a pecuniary one to the decedent's husband and children.

A better man, abler judge and more persuasive writer than the author of this opinion, speaking for the court, settled the question long ago.

In *K. P. Rly. Co. v. Cutter*, 19 Kan. 83, Justice Brewer, the patron saint of all Kansas justices, said, in dealing with the right of a husband or children to recover for wrongful death:

"Many cases have arisen in the different states under the statutes like this, and many inquiries have been made in the various courts as to the proper matters for consideration by a jury in fixing the damages. It is safe to say, that no rule has yet been laid down of definite and precise statement, and applicable to all cases. That the purpose of the statute was to give to the survivors compensation for the value of the life taken away, may be conceded; and therefore all the elements which go to make that life valuable, are proper matters of consideration; and matters which do not affect its value to the survivors, such as the pain and suffering endured by the deceased, the grief and sorrow of the survivors, are not to be considered. But how shall the value of a man's life be determined? By the needs of the survivors? Where the deceased leaves a family of small children, should the recovery be greater than where he leaves none? That logically would exclude all recovery where the deceased left no one dependent upon him. By the probable earnings of the deceased? That would often furnish the most inadequate compensation in the most deserving of all cases, as, where a wife and mother is the party killed. By the present value of the probable net accumulations of the deceased, considering his present business and expectation of life? That would be open to objections of the same character as the last, only of a far more serious nature. In the very nature of things it seems to us an exact and uniform rule for measuring the value of the life taken

away to the survivors, is impossible. The elements which go to make up the value are personal to each case. All that can well be done is, to say that the jury may take into consideration all the matters which go to make the life taken away of pecuniary value to the survivors, and, limited by the amount named in the statute, award compensation therefor." (p. 91.)

See, also, *Tilley v. Hudson River Railroad Company*, 24 N. Y. 471; *Gas Co. v. Carter*, 65 Kan. 565, 569; 74 A. L. R. 97; *Gulf, Cal. and S. F. Ry. v. Younger*, 90 Texas 387, 38 S. W. 1121, 1 Am. Neg. Rep. 378; and *Aronson v. Everett*, 136 Wash. 312, 239 Pac. 1011.

Defendants argue that the testimony of plaintiff's expert witness as to the amount of gas that had passed through the meter in the short time it had been connected and his testimony about the tests which showed the gas line in the rear of these buildings to be tight require that the demurrer be sustained. We cannot give these two circumstances that much weight, however. They should have been and no doubt were considered by the jury along with all the other facts and circumstances.

Defendants' demurrer to the evidence of plaintiff was properly overruled.

We pass now to a consideration of the argument of defendants as to trial errors. At the outset of their brief counsel for defendants state that practically every rule of evidence that could be invoked in a damage action of this kind was violated in the trial of this case. Counsel then proceeds to arrange these errors into nine different groups and presents a separate argument as to each one. The first one of these is as follows:

"Was it proper to admit testimony concerning leaks in service lines in other parts of the city in no way connected with the service to the Chapman building where such leaks occurred some 6 to 15 years prior to the date of the explosion and approximately one year after the explosion?"

Under this head defendant points out witnesses were permitted over the objection of defendants to testify concerning other leaks. One was at the grade school a block and a half from the Chapman building a year after the explosion; another was at Tab Lane's pool hall, which we have already mentioned; another was about a leak in the customer's service two blocks from the scene of this explosion and about fifteen years before, another was at the Methodist church six or seven years before this explosion. Defendants invoke the rule that in an action for damages for a tort, evidence of a similar tort by the alleged tort feasor many months later ordinarily is not admissible. *Prymek v. Herink*, 131 Kan. 77, 288 Pac. 412. Plain-

tiff meets this argument by saying that the company was bound to take notice of its past experience and these various leaks were a part of that experience and it was competent to show them and to show that with the history of leaks in its system no adequate system of inspection had been devised by the company. We have concluded that the correct rule is laid down in 3 Thornton Oil & Gas, sec. 1099, p. 1503. That rule is:

"But if the charge is that the gas pipes were old and decayed, or had been injured by the soil in which they were laid, or by electrolysis, then evidence of other leaks nearby or in the same neighborhood, where the conditions are the same, is admissible to show that the gas company had notice that the pipes had become decayed by long use, or affected by the nature of the soil, or by electrical action, at the place from which it is charged the gas escaped, and consequently fix upon it the charge of negligence in not finding and repairing the particular defect."

That rule sends us to an examination of this record with the view of ascertaining how near in point of time, place and general circumstances were these instances to the time and place of this explosion. We have concluded that the only one which was near enough to it in point of location, time, character of soil and other surrounding circumstances was the evidence as to what occurred at Tab Lane's pool hall. That was only a few doors away, the pipe was laid in the same sort of soil, all the buildings in the immediate vicinity but the Chapman building had cement floors and it happened before this explosion. The other evidence argued under this head was incompetent and should not have been admitted. We think this evidence was so prejudicial that its admission requires a new trial.

This opinion might end here but since there is to be a new trial there are some questions on the admission of evidence that should be answered.

The next question is:

"Was testimony of individual citizens that they themselves had never seen the defendants inspect or repair their lines in the city of Belle Plaine, admissible to prove negligence on the grounds of failure to inspect?"

In this connection defendants point out that three witnesses were asked whether they had ever seen defendants inspect or repair their lines. Two stated the occasions on which they had seen them doing so and one stated that he had not.

Defendants rely on the rule that evidence that a fact or event did or did not occur at a particular time is not admissible to show that

another fact or event did or did not exist or occur at another time. See 22 C. J. 750.

This question cannot be answered quite that readily. One of the grounds of negligence upon which plaintiff relies to recover is failure to inspect, a corollary of failure to inspect is failure to test. It is well known that there are devices available to gas industry by which those entrusted with the operation of a natural gas distributing system may have access. The testimony of these witnesses went quite a bit further than that they had not seen something happen at a particular time. If a party has the burden of proving that certain things did not happen they can do so by the testimony of witnesses who on account of their position or on account of some other circumstance would have seen this event if it had occurred and who testify that they did not see it. Belle Plaine is a typical small Kansas country town. It only had about 260 gas consumers. We are all familiar with life in such a town. One witness had been city marshal for eight years. He had also been water superintendent. He testified without objection to one occasion when he had seen defendants testing their lines. Then over objection he was asked whether since 1939 he had seen defendant gas company make any test of its lines and answered that he had three or four weeks ago. This man's duties kept him in, on, and around the streets and alleys of the city. Indeed it was part of his official duties as chief of police to take notice of any testing of gas mains done by the company and since he had not seen the company doing any inspecting or testing it was competent as a circumstance to prove that none had been done. About the only way plaintiff could prove the defendant gas company had not inspected was in some such manner. One of the other witnesses of whose testimony on this question defendants complain had held various offices, the duties of which took him to all parts of the city at all hours. While the other witness had never held an office in the city, he had lived there a number of years and had ample opportunity to know of any testing or inspection work the company was carrying on. The defendant gas company had the duty to make reasonable inspections of its lines. Its attention had been called to the odor of gas in the rear of these buildings and a reasonable inspection would have disclosed the condition they were in. The rule is stated in a note at 25 A. L. R. 267, as follows:

"A gas company not only must see that its pipes and fittings are of such material and workmanship, and are laid in the ground with such skill and care,

that gas will not escape therefrom when new, but it must maintain such a system of inspection as will insure reasonable promptness in the detection of leaks that may occur from the deterioration of the material of the pipes, or from any other cause within the circumspection of men of ordinary skill in the business; and a failure to take such precaution is negligence."

See, also, *Brown v. Kansas Natural Gas Co.*, 299 Fed. 463. There it was said:

"Defendant argues in effect that, as its pipe had been in the ground for 17 years without leaking, it had the right to assume that it would so continue until actual notice of deterioration or leak was brought to its attention. We cannot subscribe to any such doctrine. On the contrary, the evidence made it, after the lapse of such a time, an issue of fact whether defendant was negligent if it failed to discover that its pipe was corroded and rusted, and liable to such leaks as were actually disclosed by the tests made after the accident." (p. 266.)

It is a little difficult to discover just why defendant gas company argues this was incompetent evidence since some of its own employees testified that it never had systematic programs of inspection or testing even though their records showed the loss of from 45,000 to 134,000 cubic feet of gas a month. At any rate in view of all the surrounding facts and circumstances the admission of the evidence of which defendant complains under this head was not error.

The next question argued by defendants is whether it was permissible to admit testimony of qualified and unqualified witnesses as to the life of pipe. As this question is stated it must be answered partly at least in the negative. Of course it would not do to permit an unqualified witness to answer such a question. We are unable, however, to find where any unqualified witness did give such an opinion. Mr. Cushman, one of these witnesses, was a plumber, knew about the soil in this alleyway and had had experience with pipe laid in that soil. He testified as to the life of black pipe, the sort used in this system. We find no reason why this evidence should not have been admitted. Other arguments raised as to the admissibility of this evidence bear more on its weight than on its competency.

The next question argued by defendants is whether it was proper to admit immaterial testimony introduced only for the purpose of prejudice, hearsay testimony, improper hypothetical questions and expert opinion testimony by unqualified witnesses. The way this question is stated the answers must be "No" as to each type of testimony.

We must examine the record, however. The testimony of the witness that a guard warned him some days after the explosion not to build a fire in the alley to burn trash, also the testimony of another witness that he heard Mr. Goheen having an argument one evening a week or two after the explosion, while not so prejudicial as to require the granting of a new trial by themselves, do not appear to be competent.

The same may be said of the questions asked the chief counsel for the gas company as to whether the gas company had obeyed certain rules of the corporation commission. Other arguments upon this question do not appear to be good.

The next question argued under this heading is whether it was proper for the court and counsel for plaintiff to repeatedly ask incompetent questions after objections had been sustained to them. We find nothing under the heading that requires a more detailed discussion. The point is not well taken.

So much for the questions of admissibility of evidence. The argument that a new trial should have been granted on account of newly discovered evidence need not be considered by us since there is to be a new trial and the same questions will not arise again.

The argument that the general and special verdicts of the jury are not supported by the evidence are based upon mere speculation, supposition and conjecture and are contrary to the evidence have all been dealt with by our conclusion that the court was right when it overruled the demurrer to the evidence. The argument is not good.

Defendants finally argue that their motion for judgment upon the answers to special questions should have been sustained. It is not clear upon just what the defendants rely to support this argument. We find no answer to any special question that would require a judgment for the defendants.

It follows that the judgment is set aside with directions to grant defendants a new trial in accordance with the views expressed herein.